IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | Chapter 13 |
| GARY L. MILEY and | * | |
| CRYSTAL M. MILEY, | * | |
| a/k/a CRYSTAL BREIDEGAM, | * | |
|     Debtors | * | Case No.: 1-05-bk-07872MDF |
| | * | |
| GARY L. MILEY and | * | |
| CRYSTAL M. MILEY | * | |
| a/k/a CRYSTAL BREIDEGAM, | * | |
|     Plaintiffs | * | |
| | * | |
| v. | * | Adv. No.: 1-05-ap-00203 |
| | * | |
| MORTGAGE ELECTRONIC | * | |
| REGISTRATION SYSTEMS, INC., | * | |
| nominee for AEGIS WHOLESALE | * | |
| CORP., n/k/a AURORA LOAN SERVICES, | * | |
| PNC BANK, and WACHOVIA BANK, | * | |
|     Defendants | * | |

## OPINION

When Gary L. Miley and Crystal M. Miley ("Debtors") filed for bankruptcy, their residence was subject to mortgages held by Mortgage Electronic Registration Systems, Inc., nominee for Aegis Wholesale Corp., now known as Aurora Loan Services ("MERS"), PNC Bank, National Association ("PNC") and Wachovia Bank, N.A. ("Wachovia") (collectively "Defendants"). Debtors filed the instant adversary case requesting the Court to determine the validity and priority of certain liens against their residence held by the Defendants. To reach this decision, the Court must determine the appropriate date for valuing the residence, its value and the respective priorities of the three liens.

1

## PROCEDURAL AND FACTUAL HISTORY

Debtors reside in a two-story, 2600-square-foot, wood and brick structure situated on 1.08 acres of ground in South Annville Township, Lebanon County, located approximately six (6) miles from the City of Lebanon, Pennsylvania. In their petition, Debtors valued their home, which was built in 1989, at $230,000.00.

In 1998, Debtors executed a note and mortgage in favor of Temple Inland Mortgage Corporation ("Temple") in the amount of $172,800.00.[1] Several years later, Debtors obtained a small business loan from PNC in the amount of $168,000.00, which was secured by the assets of their business, Cocoa Tan, and their residence. Although the note and mortgage was executed on April 7, 2003, the mortgage was not recorded until April 25, 2003. Between the date the PNC note and mortgage were executed and the date the PNC mortgage was recorded, Debtors obtained a $76,125.00 loan secured by their residence from Wachovia.[2] However, Wachovia did not record its mortgage until May 8, 2003. When Debtors obtained the new loan from Wachovia, they did not disclose that they had closed on a loan with PNC approximately three weeks earlier.

Two years later, Debtors obtained a $171,000.00 loan from MERS to refinance the Temple loan. The MERS mortgage was recorded, and the Temple mortgage was marked satisfied. Prior to execution of the MERS mortgage, MERS obtained subordination agreements from PNC and Wachovia, but neither agreement was recorded. MERS does not have the original

---

[1] In the hearing on this matter, Debtor Gary Miley referred to the Temple mortgage as being held by Countrywide (N.T. 10). In its brief, MERS stated that Countrywide serviced the Temple loan.

[2] Debtor Gary Miley testified that Wachovia held a mortgage on the residence in 2002 and that the 2003 Wachovia loan was a refinancing of the prior loan (N.T. 16).

postponement of mortgage document executed by PNC in its possession. As stipulated to by the parties, the balance due to MERS as of May 28, 2007 was $177,700.30; the balance owed to PNC as of May 7, 2007 was $155,055.71; and the balance owed to Wachovia through May 11, 2007 was $77,644.85.

A hearing was held on May 15, 2007, at which time PNC and Debtors presented appraisal testimony to support the values of the property both as of the hearing date and as of the petition date. The matter is ready for decision.[3]

## Discussion

Before addressing the priorities of the liens held by the Defendants, the Court will determine the value of the residence, which will then allow for the determination of the secured status of Defendants' claims. However, before the value of the residence may be ascertained, the Court must determine the appropriate valuation date.

### I. Time of Valuation

The Court received evidence regarding the value of Debtors' residence from two appraisers, one retained by Debtors and one by PNC.[4] Edmund Koppenhauer ("Koppenhauer") performed an appraisal for PNC on April 17, 2007 and valued the home at $321,000.00 as of that date. He also opined that the value of the property as of November 1, 2005 was $256,400.00.

---

[3] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A), (K)and (O). This Opinion constitutes the findings of fact and conclusions of law required to be made pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7052.

[4] MERS offered a third appraiser's report into evidence. However, since the appraiser who prepared the report did not testify at the hearing, the report was not admitted for purposes of establishing the value of the property.

3

Robert Jones ("Jones") performed an appraisal for Debtors on May 4, 2007. He valued the residence at the time of trial at $280,000.00. He further opined that the value of the home in October 2005 was $235,000.00. The appraisers provided two valuations because the parties dispute whether the value of a secured claim under § 506(a) is determined as of the petition date or at some later date. Debtors argue that the value of their residence should be determined as of the October 12, 2005 petition date. PNC, Wachovia and MERS assert that the date of trial is the appropriate date.

Valuation of real property "has inherent vagaries" and is not an exact science. *In re Brown*, 289 B.R. 235, 238 (Bankr. M.D. Fla. 2003) (quoting *In re Monica Road Assocs.*, 147 B.R. 385, 389 (Bankr. E.D. Va. 1992)); *In re Arnold & Baker Farms*, 85 F.3d. 1415, 1421 (9th Cir. 1996). "Determining the present value of property, such as real estate, is already a complicated issue, and calculating the historic value of property is even more complicated." *In re Lynch*, 363 B.R. 101, 105 (9th Cir. BAP 2007) (quoting *Warren v. Peterson*, 298 B.R. 322 (N.D. Ill. 2003). The imprecision of real estate appraisals is more pronounced when an appraiser is asked to value property on an historical date because on the valuation date, the appraiser is unable to view either the subject of the appraisal or the properties chosen as comparables.

In the within case, the disparities in the appraisals were attributable primarily to different views on the impact of deferred maintenance on the subject property. Both appraisers testified that they assumed that the property was in the same condition in 2005 as it was when they performed appraisals in 2007, but no justification was provided for this assumption. As observed by the *Lynch* court, attempting to calculate the value of an asset as of an historical date applies an additional layer of conjecture onto what is by its nature a speculative endeavor. Nonetheless,

4

§506(a) clearly envisions that the date for valuing collateral is variable and is dependent upon a variety of factors. I am compelled to follow this statutory mandate, which provides as follows:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.*

11 U.S.C.A. § 506(a) (italics added).[5]

The italicized language is at the center of the threshold issue in the instant case: what is the appropriate date for valuing collateral for purposes of treating secured claims in a chapter 13 plan? Neither the Supreme Court nor the Court of Appeals for the Third Circuit have addressed this issue. In *Wood v. LA Bank (In re Wood)*, 190 B.R. 788 (Bankr. M.D. Pa. 1996), Judge Thomas made a comprehensive survey of the cases that have addressed this issue. He noted that court decisions on the relevant date for § 506(a) valuations have not been uniform. Some courts have adopted the petition date, others the confirmation date, and still others a variety of other dates. *Id.* at 790 - 91. After considering these decisions, Judge Thomas held that adoption of *any* bright line rule would conflict with the language in § 506(a), which directs that the purpose of the valuation be considered as well as the proposed disposition or use of the collateral. He advanced a flexible, multifaceted test that considers administrative matters, bankruptcy policy and the effect that the selection of a particular date will have on the parties. *Wood*, 190 B.R. at 794-95. The *Wood* test includes the following eleven factors: (1) whether the postpetition change in value

---

[5]Section 506 was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, which became effective on October 17, 2005. The instant case was filed prior to the effective date of the amendments.

5

was due to a debtor's efforts; (2) the expectancies of the parties at the time of the loan; (3) the benefits of adopting a uniform approach; (4) the convenience of administration; (5) the equitable concept that those who bear the risk should benefit from the rise in value; (6) avoidance of a windfall to either party; (7) the policy that prepetition liens extend to postpetition proceeds in certain situations; (8) the policy of requiring adequate protection payments to a creditor holding depreciating collateral; (9) the debtor's "fresh start;" (10) the impact of using a particular valuation date on the estate, including the impact on senior and junior lien creditors; and (11) whether the party that benefits from a later valuation has been responsible for the delay in seeking a determination of value. *Wood,* 190 B.R. at 794-95 (citation and footnote omitted).

I agree that the plain language of § 506(a) demonstrates that bankruptcy courts have broad discretion to determine value based on the purpose of the valuation and the proposed disposition or use of such property. *See In re Embassy Properties North, Ltd. Partnership*, 196 B.R. 172 (Bankr. D. Kan. 1996) (phrase "in conjunction with [confirmation] hearing" in § 506(a) accords bankruptcy court broad discretion to value secured claim as of petition date, confirmation date or some other date). A plain reading of the modifying phrase "and in conjunction with any hearing" regarding such disposition or use of the property recognizes that a court's valuation of collateral should consider the timing of the valuation hearing. *In re Stanley*, 185 B.R. 417, 423 - 24 (Bankr. D. Conn. 1995). In a chapter 13 case, valuations are made at different times for different purposes. Accordingly, in order to determine the appropriate valuation date, I will apply the applicable factors set forth in *Wood*.

The *Wood* analysis is comprehensive, but several of the factors cited have limited applicability to the facts in this case. Therefore, I will only address the *Wood* factors that I find

6

to be relevant.

  a.  *Whether postpetition change in value were due to a debtor's efforts*

Both appraisers testified that Debtors' residence appreciated in value during the eighteen-month period between the petition date and the hearing due to market conditions. The residence was described as being in "average" condition by Koppenhauer and in "average-fair" condition by Jones at the time of inspection. Accordingly, the increase in value since the filing of the petition was not attributable to Debtors' efforts, but to the general rise in home values during the relevant period.

  b.  *The expectancies of the parties at the time of the loan*

This factor weighs in favor of valuing the liens at the latter date. When Wachovia entered into the loan agreement with Debtors, it was unaware of the intervening PNC loan, which had not yet been recorded. Therefore Wachovia believed that it was in second position to a loan with an outstanding balance of approximately $172,000 rather than in third position to two loans totaling in excess of $325,000.00.[6] If PNC's loan had been recorded when Wachovia's loan closed, Wachovia would have been on notice of the prior lien and in a position either to decline to make the loan or to obtain other collateral. It is unknown whether Debtors believed that all of the loans were fully secured when they entered into each loan agreement. Based upon the testimony of Gary Miley, it does not appear that he gave it much thought. However, from the evidence

---

[6]Debtors assert that Wachovia must have known when it made the loan that there was no equity to which the mortgage could attach. To the contrary, the records in the recorder of deeds office only would have provided notice of the Temple loan. Therefore, to fully secure both the Temple and Wachovia loans, the property would have to have been worth approximately $250,000 in 2003. Wachovia was on notice that it was undersecured, but no evidence was presented that it should have known that it was unsecured.

7

presented, the Court concludes that all three lenders, including Wachovia, believed they were secured when they extended loans to Debtors.

      c.    *The equitable concept that those who bear the risk should benefit from the rise in value and the avoidance of a windfall to either party*

This factor favors using the trial date as the point at which the collateral should be valued. Jones testified that the property appreciated 19% in value between the petition date and the hearing date, and Koppenhauer determined that the property's value increased by 25% during the same time frame. Debtors had no equity in the property when they filed their petition as the three mortgages clearly exceeded the value of the property. Therefore, if the value of the liens are measured against the 2005 value of the collateral rather than the value as of the hearing date, Debtors will reap a windfall. They will be able to retain the appreciation in value that accrued since the filing of the petition while effectively freezing the interest of secured parties as of the filing date. Using the valuations presented at trial more closely approximates the confirmation values and avoids a windfall to any party. This view is consistent with the Supreme Court's holding that any appreciation in the value of collateral should be used "to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors." *Dewsnup v. Timm,* 502 U.S. 410, 417, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

      d.    *the debtor's "fresh start"*

Debtors' fresh start is enhanced by a determination that the collateral should be valued as of the petition date. Because the residence appreciated in value significantly between 2005 and

8

Case 1:05-ap-00203-MDF    Doc 44    Filed 10/04/07    Entered 10/04/07 08:54:29    Desc
Main Document      Page 8 of 18

2007, Debtors would be able limit the value of the liens on the residence to their worth on the petition date while retaining the value that accrued in the intervening period.

>    e.  *The impact of using a particular valuation date on the estate, including the impact on senior and junior lien creditors*

As all of the parties acknowledge, the use of the lower value on the petition date would not affect the creditor that is found to be in first position because even the lowest appraised value of the property exceeds each individual claim. However, as I explain below, if the 2005 rather than the 2007 valuations are used, Debtors will be able to make more significant modifications to PNC's claim.

The only factor that favors the use of the petition date to value the residence is the Debtors' entitlement to a fresh start. All of the remaining relevant factors support the use of the later appraisals which will more closely approximate the values at the date of confirmation or the effective date of the chapter 13 plan. Therefore, I find that the hearing date is the appropriate point at which to value the residence.

## II. Value of Debtors' Residence

In determining values, a court may consider professional appraisals, but is not bound by them. *In re Belmont Realty Corp.*, 113 B.R. 118 (Bankr. D.R.I. 1990). A court is not required to select one appraisal in its entirety, but may determine which aspects of each report are most useful. *In re Brown*, 289 B.R. at 238. In this case, the Court has the benefit of the reports prepared by two qualified appraisers. Both appraisers testified credibly regarding their credentials, their methods of valuation, their selection of comparable properties and their opinions of value. Neither testified so persuasively that I am compelled to totally disregard the

9

Case 1:05-ap-00203-MDF    Doc 44    Filed 10/04/07    Entered 10/04/07 08:54:29    Desc
Main Document      Page 9 of 18

opinion of the other. Accordingly, my determination of value considers the testimony of both appraisers.

As noted earlier, Koppenhauer rated the condition of the property as "average," and Jones rated the property as "average-fair." Although they came to slightly different conclusions, the deficiencies identified by both appraisers primarily were cosmetic. Jones' opinion as to value was less persuasive than Koppenhauer's opinion because the adjustment taken for deferred maintenance was significant, although the deficiencies cited were minor. For each comparable chosen by Jones, he deducted $20,000.00 for deferred maintenance. This significant deduction was not substantiated by the testimony as to the condition of the property by either appraiser.[7] However, the adjustments in Jones' appraisal for the location of Debtors' residence when measured against the sales prices of comparable homes located in a well-maintained development are justified. Koppenhauer estimated the value of the property at the time of trial to be $321,000.00 while Jones valued the property at $280,000.00. After fully considering the testimony, I find that the value of Debtors' residence at the time of the hearing was $305,000.00.

---

[7]The highly subjective nature of appraisal testimony is illustrated by the contrasting valuations of a property located at 91 Walden Road used as a comparable by both appraisers. The property sold on December 4, 2004 and was selected by both appraisers for the petition date valuation. For reasons unexplained, Koppenhauer reported the sales price as being 240,000.00 and Jones listed the sales price as $245,500.00. Koppenhauer adjusted the value of Debtors' residence upward by $14,800.00 based on physical attributes such as room count and the existence of a pool. Jones made similar upward adjustments of $25,100.00. The significant difference in the appraisals were attributable to two factors. Jones deducted $20,000.00 for the condition of the property (although he would have had no opportunity to view the premises in 2005) and deducted an additional $12,500.00 for the perceived inferior location of the subject when compared to the Walden Road property.

### III.  Priority of Liens

The priority of liens in bankruptcy are determined by state property law. *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 918 (1979). Pennsylvania law provides that liens against real property, other than purchase money liens, have priority from the time they are left for recording. 42 Pa. C.S.A. §8141(2), 21 P.S. § 622. Based on the dates of recordation, the relative positions of the parties are as follows: PNC is first, Wachovia is second and MERS is third. MERS, however, asserts that the two liens recorded before its lien are subordinated under the terms of postponement of mortgage agreements that PNC and Wachovia admittedly executed before MERS entered into the mortgage agreement with Debtors.  PNC and Wachovia assert, however, that because these agreements were not recorded, they are not enforceable.  *See* 21 P.S. § 654.[8]  MERS responds that, although not recorded, the subordination agreements may be enforced under 11 U.S.C. § 510(a).  MERS is correct. An unrecorded agreement to subordinate a mortgage is enforceable as to the parties to the agreement without the necessity of recording. *Farmers Trust Co. v. Bomgerger*, 362 Pa. Superior Ct. 92, 98, 523 A.2d 790, 793 (1987) (when

---

[8]21 P.S. § 654 provides as follows in relevant part:
In every case where a mortgage has been . . . recorded . . . it shall be lawful for the mortgagee . . . , its successors and assigns, to postpone the lien of such mortgage or mortgages on the mortgaged premises . . . to the lien of a subsequent mortgage or mortgages . . . on the same mortgaged premises, (a) by entering a postponement upon the margin of the record of such mortgage, . . . ; or (b) by a stipulation contained in the body of the mortgage. . . ; or (c) by an agreement in writing with the mortgagor and with the subsequent mortgagee or mortgagees and any other person interested as owners of the mortgaged premises or as holders of liens thereon . . . ; which said agreement for the postponement of lien of mortgage and bond accompanying the same shall be recorded in the office of the recorder of deeds in the county where the mortgaged premises lie . . . ; the recording of which shall be notice to all persons of the facts therein contained . . . .

21 P.S. § 654.

distributing the proceeds of a foreclosure sale, consideration must be given to any agreement by the parties which affects the lien priorities among them). *See also Landau v. Western Pennsylvania Nat'l Bank*, 445 Pa. 217, 222-23, 282 A.2d 335, 338-39(1971) (unrecorded subordination agreement held to be enforceable); *G.A.G. Corp. v. Auritt,* 226 Pa. Superior Ct. 118, 120-22, 129-30, 312 A.2d 441, 443-45, 448 (1973) (rights are subordinated effective with the execution of the subordination agreement). Therefore, by executing the subordination agreements, PNC and Wachovia agreed to retain their positions as junior liens on Debtors' residence. Because these agreements are enforceable under state law, they also are enforceable under § 510(a).

### IV. Equitable Rescission of the Wachovia Subordination Agreement[9]

Although Wachovia does not dispute that it executed an agreement to subordinate its mortgage to MERS' mortgage, it argues that the agreement may be rescinded or is voidable because it was based upon a material misrepresentation of fact that was reasonably relied upon by Wachovia when it entered into the agreement.

When Wachovia agreed to lend funds to Debtors in 2003, it was unaware that PNC entered into a loan agreement with Debtors a few weeks earlier. It also failed to anticipate that PNC would record its mortgage after Wachovia disbursed funds, but before Wachovia's mortgage was recorded. Therefore, when Wachovia was contacted by MERS in 2005 about subordinating its loan, Wachovia was unaware that it held a third rather than second lien

---

[9]Although a contract dispute between two third parties not involving a debtor typically is not a core proceeding under 28 U.S.C. §157, I find that resolution of the validity of the subordination agreement between MERS and Wachovia is core because it is inextricably intertwined with the Court's determination of the priority of liens against property of the estate, which is core under 28 U.S.C. § 157(b)(2)(K).

12

position. Wachovia's witness testified that MERS' settlement agent provided Wachovia with a worksheet which stated that Wachovia was in a second lien position behind Temple's $161,261.02 mortgage. If Wachovia had requested a title search prior to entering into the subordination agreement, and the title search was accurate, Wachovia would have been aware that it actually was in a third lien position behind Temple and PNC. Although this measure would have been prudent, Wachovia's witness testified that it is the practice in the lending industry to rely on information provided by a new lender in a subordination worksheet when considering whether to agree to subordinate. This testimony was not challenged by Debtors or the other Defendants.

Wachovia advances several legal and equitable arguments why the subordination agreement should not be enforced against it. The Court has addressed and dismissed its argument that the subordination agreement is not binding because it was not recorded. However, Wachovia's equitable arguments are more complex. Wachovia asserts that the subordination agreement may be rescinded because the agreement was obtained through a material misrepresentation upon which Wachovia relied. It also asserts the doctrine of equitable estoppel bars MERS from enforcing the subordination agreement.

A party induced to enter into a transaction because of another's fraud or misrepresentations may avoid the transaction. *DeJoseph v. Zambelli*, 390 Pa. 24, 139 A.2d 644, 647 (1958); *Cf. Bortz v. Noon*, 556 Pa. 489, 505, 729 A.2d 555, 564 (1999). "Fraud arises where the misrepresentation is knowingly false, where there is a concealment calculated to deceived (sic), or where there is a non-privileged failure to disclose." *Id*. A party alleging that it entered into a contract because of a fraudulent misrepresentation by the other party must prove the

13

elements of fraud by clear and convincing evidence. *Porreco v. Porreco*, 571 Pa. 61,69 811 A.2d 566, 570 (2002).

Wachovia asserts that MERS's agent must have known that the statement in the subordination worksheet that Wachovia was in second lien position was false because MERS also obtained a subordination agreement from PNC. Although this is a logical deduction, the evidence presented at trial was inadequate to establish by clear and convincing evidence that MERS' agent knew that the information in the worksheet was false and was not merely careless or inattentive. However, even an innocent misrepresentation is actionable if the representation is made as to a material fact and the reliance on the representation was justified. A fact is material if the innocent party would not have entered into the transaction if the representation had not been made. *DeJoseph,* 139 A.2d at 647; *Greenwood v. Kadoich*, 239 Superior Ct. 372, 378, 357 A.2d 604, 607 (1976). Wachovia's witness testified that the bank would not have agreed to subordinate its loan if it had realized it would be in a third lien position behind MERS and PNC.

For similar reasons, Wachovia argues that MERS is equitably estopped from asserting that Wachovia' mortgage is subordinated to its mortgage. "Equitable estoppel is a doctrine that prevents one from doing an act differently than the manner in which another was induced by word or deed to expect." *Novelty Knitting Mills, Inc. v. Siskind*, 500 Pa. 432, 435, 457 A.2d. 502, 503 (1983). To invoke equitable estoppel, an injured party must demonstrate that there was an inducement to act and that the party was justified in relying on the inducement. *Havas v. Temple University*, 357 Pa. Superior Ct. 353, 356, 516 A.2d 17, 18 (1986) (citing *Novelty Knitting Mills, Inc.,* 500 Pa. at 435, 457 A.2d at 503. See also *Zivari v. Willis,* 416 Pa. Superior Ct. 432, 436, 611 A.2d 293, 295 (1992). According to Wachovia, it was induced to sign the subordination

agreement by the representation in the worksheet that it was in a second lien position. Further, it is an accepted practice of the industry to rely upon these worksheets, without conducting an independent title search, when deciding whether or not to subordinate to another mortgage. Because of this general practice in the lending industry, Wachovia asserts that its reliance on the representations in the worksheet were justified.

Wachovia seeks rescission of the subordination agreement, which would restore the parties to the positions they held before entering into the agreement. In some situations, however, rescission is not appropriate or even possible. This is one of those situations. There is no way to undo the subordination agreement without impacting other parties. MERS would not have proceeded to refinance the property unless these agreements had been executed. Rescinding the subordination agreement would also affect the rights of PNC, which executed a subordination agreement with the expectation that it would maintain its second lien position. Wachovia has not alleged that PNC engaged in any inequitable conduct that would justify impairing its second lien position. If the subordination agreement is rescinded, what would be the effect on the parties? Wachovia's lien would be superior to MERS' lien. But PNC is lawfully subordinated to MERS. There is no basis to justify relegating PNC to a third lien position junior to Wachovia's lien. The purpose of rescission is to restore the parties to the *status quo ante*. In this case, restoration to the relative positions of the parties as they existed before the execution of the Wachovia subordination agreement is impossible.

If the Court finds that state law remedies are unavailing, Wachovia asserts that MERS' mortgage may be equitably subordinated to its lien as provided by 11 U.S.C. § 510(c). Section 510(c) provides that:

> after notice and a hearing, the court may (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . . ; or (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). An action for equitable subordination does not challenge the existence or validity of the underlying debt. Rather, it challenges the priority the debt otherwise would enjoy absent a creditor's inequitable conduct. Most courts have required an injured party to prove three elements before equitably subordinating a claim: "(1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code." *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims (In re Papercraft Corporation)*, 160 F.3d 982, 986-87 (3d Cir. 1998) (citations omitted). In both *Papercraft* and, more recently, in *Cohen v. KB Mezzanine Fund II, LLP (In re Submicron Systems Corporation),* 432 F.3d 448, 462 (3d Cir. 2006), the Court of Appeals for the Third Circuit declined to address the issue of whether misconduct is a prerequisite to equitable subordination. The Circuit explained that it was hesitant to make misconduct a requirement because equitable subordination "is remedial, not penal, and should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct." *Cohen v. KB Mezzanine Fund II, LLP (In re Submicron Systems Corporation)*, 291 B.R. 318, 327 (D. Del. 2003) cited in *Submicron Systems Corp*, 432 F.3d at 462 (internal citations omitted). In the within case, although there are indications that MERS' agent either knew or should have known that PNC was in second lien position, I am not able to find that MERS engaged in "inequitable conduct." However, because of the status of

16

Wachovia's lien prior to the execution of the subordination agreement, it is unnecessary for me to determine whether inequitable conduct is a prerequisite to a finding that equitable subordination is appropriate .

Although Wachovia believed it was in second lien position when it was requested to subordinate its mortgage, it actually was in third position. Therefore, it would be inequitable to place Wachovia in a position superior to that it would have enjoyed if MERS had never entered the picture. At the time MERS solicited the subordination agreement in May 2005, the outstanding amount due Temple was $161, 261.02. PNC's second mortgage secured a loan in an original amount of $168,000.00 in April 2003, with a payoff amount of $155,055.00[10] on the date of the hearing. Therefore, when Wachovia and PNC were negotiating with MERS to subordinate their mortgages, the outstanding balance due to PNC was somewhere between these two amounts. When the outstanding amount secured by Temple's first lien is added to the outstanding amount due to PNC, it clearly exceeds the value of the residence. At no time after the PNC mortgage was recorded was Wachovia in a secured position, although the bank may have been unaware of its true status. Even if rescission of the subordination agreement were feasible, I would have to consider whether Wachovia actually was harmed. Wachovia's assertion that it would not have agreed to subordinate if it had known that it would occupy a third lien position behind MERS and PNC is irrelevant. If Wachovia had refused to subordinate its mortgage, MERS would not have agreed to refinance the first mortgage, and Wachovia would have remained in a third, unsecured position. Accordingly, although Wachovia has established

---

[10]The payoff amount of the PNC loan at the date of the hearing credited the post-petition liquidation of other collateral held by PNC to secure the loan.

factors that would support equitable estoppel, rescission and equitable subordination, the Court has determined that it would be inappropriate to grant relief that would place Wachovia in a position superior to that it would have enjoyed if MERS and Wachovia had not entered into the subordination agreement.

## V. Conclusion

In conclusion, I find that for purposes of determining the secured status of the claims of MERS, PNC and Wachovia under 11 U.S.C. § 506(a), the appropriate valuation date is the date of the hearing on Debtors' complaint to determine the validity and priority of the liens. I further find that the value of Debtors' residence at the time of the hearing was $305,000.00. Having determined the value of the property, and the parties having stipulated to the outstanding loan balances as of May 2007, for purposes of 11 U.S.C. §§ 1322(b)(2) and 1325(a)(5), the secured claims of MERS, PNC and Wachovia are as follows: MERS is fully secured in a first lien position, PNC is secured in a second lien position in the amount of $127, 299.70 with the balance of its claim being unsecured, and the claim of Wachovia is unsecured.

An appropriate order will be entered.

By the Court,

Mary D. France
Bankruptcy Judge

Date: October 3, 2007

*This document is electronically signed and filed on the same date.*